[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
I. The Dissolution of the Marriage
It is found that all of the allegations of plaintiff's complaint have been proven, that the marriage of the parties has broken down irretrievably, and the marriage is ordered dissolved for that reason.
II. The National Westminster Bank Account
There appears on plaintiff's financial affidavit a notation that a National Westminster bank account containing $25,942.00 was being held by her on behalf of her mother and was not considered by plaintiff to be part of the marital estate of the CT Page 1567 parties. In defendant's proposed orders he claims a one half interest in said account stating that there was "no signed agreement evidencing these moneys" other than plaintiff's uncorroborated testimony.
The court's notes on this subject are brief, and this account did not appear to be the subject of controversy until shortly before the completion of the trial and defendant's final agreement. Plaintiff's testimony was to the effect that the account represented her mother's life savings and that her mother had entrusted it to her for fear of its being confiscated if it remained in Russia. Defendant offered no contradictory testimony on this subject. There is no evidence that defendant contributed in the slightest to the accumulation of any of such funds.
Plaintiff's testimony on this as well as on all other issues has possessed the ring of truth. The court determines that said bank account belongs solely to plaintiff's mother and should not be considered part of the marital estate of the parties.
III. The Marital Estate of the Parties
Plaintiff
1997 Hyundai Accent $4,500.00 Household Furniture and Computer Equipment ----- Chase Checking Account 2,688.00
 National Westminster Bank — $25,942.00 (held by Plaintiff on behalf of mother Lyudmila Umudumovanot considered a marital asset) ___________ Total $7,188.00
Defendant
1998 Honda Accord $17,000.00 1994 Hyundai Excel 3,000.00 Household furniture, computer equipment, et al. --- Citibank c/a 489.00 Total $20,489.00
Total Marital Estate $27,677.00
IV. The Evaluation of the Evidence in Accordance with the Provisions CT Page 1568 of Sec. 46b-81c C.G.S.
A. General Background Information
The plaintiff wife, who is 27 years of age, and the defendant husband, who is 28 were married in Ottowa, Illinois on January 7, 1994, five years ago. The plaintiff was born in St. Petersburg, Russia and first met the defendant in the autumn of 1993 while studying to obtain an M.B.A. degree at the University of Northern Iowa. Defendant was also a graduate student there at that time. The courtship progressed at a "torrid pace" and the parties married the following January. From that time until May, 1995 plaintiff lived in a dormitory while defendant resided with his grandmother in Illinois, defendant having left school after an attack of mononucleosis. After the plaintiff's graduation, the parties resided in an apartment defendant had obtained in Illinois. Defendant had obtained a position as a shoe salesman at Nordstroms, while plaintiff obtained employment as an underwriter.
In April, 1997, the parties moved to Simsbury, Connecticut where plaintiff had secured her present position at Executive Risk. In July, 1997, the defendant finally managed to obtain work as a salesman at Bernies in Westfarms Mall. When Nordstroms opened at that location defendant transferred to that department store.
In February, 1998, the defendant expressed disappointment with his progress at Nordstroms and spoke of plans to open his own hobby store back in Illinois. Plaintiff took initial steps to obtain employment there while defendant returned to Illinois later that month.
After plaintiff returned to Connecticut from a quick trip to Russia to visit her dying grandmother, a dispute arose that resulted in the final separation of the parties. Defendant had resigned his position at Nordstroms in Illinois and wanted plaintiff to move immediately to that state where they would begin a new business enterprise. Plaintiff considered it imprudent to abandon her work in Connecticut before being assured of a position in Illinois, inasmuch as at the time she was the only breadwinner in the family. Defendant, during plaintiff's absence in Russia, had removed all of her clothing and personal effects to his Illinois apartment. Not surprisingly ultimatums were issued and defied. The parties have been apart since April, CT Page 1569 1998.
B. The Education and Health of the Parties
1. Plaintiff
Plaintiff has a B.A. degree as well as an M.B.A. from the University of Northern Iowa. She spent one year as an exchange student at Grimmel College, also in Iowa. She appears to be and describes herself as being in good health.
2. Defendant
Defendant has a B.A. degree in economics and business administration from Illinois State University. He abandoned his plan to obtain an M.A. degree following an attack of mononucleosis.
While he gives the appearance of being in robust good health, he has asserted that he has a problem with his stomach, that "acid comes into my chest — Tagamet helps — I'm not under a doctor's care — some morning I get the dry heaves." He also claims that he is depressed at times and testified that he has taken Prozac on a regular basis since April, 1998.
C. Employment History of the Parties
1. Plaintiff
Plaintiff has been continually employed in the field of finance since her graduation in May, 1995. She is presently a senior analyst at Common Fund Capital in Westport, Connecticut. This fund manages the capital of university endowments which it invests in private equities. One of plaintiff's tasks is to select the managers for such funds. Her current financial affidavit indicates a gross weekly income of $1,458.00 with a weekly net after the usual deductions of $980.00. In her testimony she stated that she had divided her semi-monthly pay check by two to obtain these figures so in actuality her weekly income would be slightly less.
2. Defendant
Defendant stated that in the spring of 1994, shortly after his marriage, he obtained employment at Famous Footwear where he CT Page 1570 soon was moved to store manager. He remained there until Christmas time, 1994 at which time he was earning $21,500.00 annually. Thereafter, he states he was a shoe salesman at Nordstroms until he moved to Connecticut. Following employment in the sale of shoes in Connecticut he returned to Illinois. He testified that he earned $35,000.00 in 1995, $40,936.00 in 1996 and $27,400.00 in 1997.
Defendant is currently employed by Caldwell Banker in Naperville, Illinois where he sells real estate on commission. He stated that the average of such commissions since last summer has been $109.00 weekly.
3. Other Information
Plaintiff testified that when the parties lived in Illinois in 1995-97, defendant earned "in the mid" $30,000.00 as a shoe salesman and that she, working two jobs, was earning $33,000.00. She further stated that when they moved to Connecticut in April, 1997 and she obtained a position at Executive Risk, she received a basic annual salary of $40,000.00 together with a $3,000.00 bonus and a $10,000.00 signing bonus.
D. Fault
Following is a summation of the testimony of each party on this issue.
1. Plaintiff:
Plaintiff stated that defendant hit her on two or three occasions and that she might have hit him back. She did not have a clear memory of the time or place of these events. She also stated that she and defendant had a communication problem, that he was domineering resulting in her feeling oppressed, and that he was hard to live with, her strong personalty notwithstanding.
2. Defendant
In defendants words "after the marriage the torridity decreased. I fawned on her during the marriage, was faithful to her. I had suspicions about her. She told me "you have no proof." She talked to guys on the Internet saying "these people are more intelligent than you. She resented getting her mother into this country and took it out on me. I blame her for my quitting my job at Nordstrom. She resisted pregnancy. Her career was most CT Page 1571 important to her."
Plaintiff admitted to one act of infidelity to defendant in the spring of 1997.
3. The $50,000.00 Joint Account
Between the date of their marriage in 1995 and the spring of 1998 the parties managed to save $50,000.00 which they placed in a joint bank account. During questioning by the court as to how this young couple managed to save so large a sum in so short a period of time, plaintiff stated "By penny pinching. I was proud of us. We were a two income family that worked hard and didn't do anything."
When plaintiff returned to Connecticut from Russia in April, 1998 she discovered that defendant had removed the entire $50,000.00 from the account and had it in his possession in Illinois. Plaintiff testified that when she called defendant and questioned him on this issue he said "Prepare papers showing that I get $34,000.00 and you $16,000.00 or I'll turn you over to the I.N.S. and you'll be thrown out of the country. You married me just to get into the country." What ultimately transpired was that plaintiff received $16,600.00 from defendant with his retaining the balance, hardly, in the court's opinion, an equitable division of their joint account.
4. Other Information on the Issue of Fault
Interwoven throughout all the testimony on the issue of fault is the complaint by defendant and the denial by plaintiff that she married him only so that she could become a United States citizen. The evidence on this subject begins in February, 1995 at which time plaintiff testified that she had filed a petition for residence status. She further stated that in October 18, 1995 she had an interview with I.N.S. (Immigration and Naturalization Service) at which time she received a green card. She further added that she and defendant had worked together on all the paperwork and that one of the conditions of the green card was that she remain married for two years. In October, 1997, the parties filed a joint petition to withdraw this condition. Later, after the present dissolution action had been commenced, plaintiff's attorney withdrew the joint petition and submitted instead one for plaintiff alone wherein she declared that "there was a bona fide marriage that didn't work." Commenting on CT Page 1572 defendant's request for an annulment in his counter-claim, plaintiff stated it to be "out of vengeance" and an effort to prevent her from becoming a United States citizen.
After weighing all the evidence, this court concludes that plaintiff did not marry defendant "in order to become a citizen and/or to get her mother into this country" but rather that in plaintiff's words "it was a real marriage: it had its ups and downs but on the whole was happy."
Conclusion as to Fault
The court is faced with two educated young people of different backgrounds neither of whom was willing or able to make the compromises required in a successful marriage. It finds that such fault as may have caused the breakdown of their marriage is evenly divided between the parties.
Final Conclusion
In concluding argument defendant's counsel described his client as "a simple guy from the middle west who is mentally disordered, is on Prozac and can hardly digest his food." That observation was not shared by the court. Rather, it felt plaintiff's counsel described the marriage more accurately as one of "distance and demands a real marriage with real problems."
After having reviewed and weighed all the evidence as it relates to Sec. 46b-81c C.G.S. this court decrees that each party retain such property as is listed in Article II (supra) to the exclusion of the other party.
V. The Distribution of Marital Estate in Accordance with theFindings Made in Article IV. (Supra)
Plaintiff
1997 Hyundai Accent $4,500.00 Household Furniture and Computer Equipment --- Chase Checking Account 2,688.00
National Westminster Bank — $25,942.00 (held by Plaintiff on behalf of mother Lyudmila Umudumovanot considered a marital asset) CT Page 1573 __________ Total $7,188.00Defendant
1998 Honda Accord $17,000.00 1994 Hyundai Excel 3,000.00 Household furniture, computer equipment, et al. --- Citibank c/a 489.00 __________ Total $20,489.00
VI. Supplemental Orders Relating to the Distribution of theMarital Estate
A. Each party shall execute all instruments required to carry out all orders of this court.
B. The Defendant shall return to plaintiff immediately and at his own expense all personal papers of plaintiff, including tax documents and I.N.S. documents located at his residence or that of his grandmother.
C. Defendant shall transfer to plaintiff title to the motor vehicle described in her financial affidavit as a 1997 Hyundai Accent.
D. Defendant shall return to plaintiff, at his own expense and insured, as need be, the items as shall be agreed upon and filed with the court by counsel within two weeks from the date hereof. Such division of personalty shall become an order of the court upon its filing. In the event counsel are unable to agree upon which items of personalty shall be returned to plaintiff, then counsel and the parties shall be ordered by the court to appear at Family Relations Offices at the Superior Court in Hartford for mediation and resolution of the issue not later than five weeks from date hereof.
VII. Other Orders
A. Alimony
Having considered all of the evidence as it relates to Sec.46b-82 C.G.S. including the awards and findings it made pursuant to Sec. 46b-81 C.G.S., this court makes no award of alimony to either party. CT Page 1574
In entering this order the court is mindful that defendant for the past several months has earned little more than $100.00 weekly while plaintiff's weekly income has risen to about $980.00. The evidence, however, also indicates that until defendant voluntarily quit his job at Nordstroms and the parties separated, their incomes were substantially the same. It is also noted that defendant has a college degree and in the past has had success in the sale of merchandise. On all of the evidence, the defendant's proposal that plaintiff provide support for him in the annual amount of $35,000.00 for a period of five years is unrealistic and unwarranted. Defendant would be better served by seeking and obtaining employment as a salesman of products where in the past he has enjoyed success equal to that of plaintiff. Defendant's earning capacity is clearly far greater than his present stated earned income. See Miller v. Miller,181 Conn. 610, 611-612 (1980).
B. Liabilities
Each party shall be solely responsible for the debts listed on his or her financial affidavit and shall hold the other party harmless in that regard.
C. Counsel Fees
No counsel fees are awarded to either party.
D. Health Insurance
Plaintiff is ordered to maintain defendant on her present health policy for the maximum period prescribed by law under COBRA, at her cost and expense, or until such time as defendant is able to secure his own health policy through future employment, whichever event sooner occurs.
By the Court
___________________________ John D. Brennan Judge Trial Referee